### In re BRIDGEPOINT NURSERIES, INC., Debtor.

#### Bankruptcy No. 92–30007.

United States Bankruptcy Court, D. New Jersey.

Jan. 2, 1996.

Markowitz and Zindler, Brian W. Hofmeister, Lawrenceville, New Jersey, for Debtor.

Wilentz, Goldman & Spitzer, P.C., Joan Sirkis Lavery, Woodbridge, New Jersey, for Amboy National Bank.

Cohn Bracaglia, John Bracaglia, Jr., Chapter 7 Trustee, Sommerville, New Jersey.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

## PROCEDURAL BACKGROUND

This matter comes to the court as a hearing on the objection of Bridgepoint Nurseries, Inc. ("debtor") to a proposed settlement of controversy between the chapter 7 trustee and Amboy National Bank ("Amboy").

John Bracaglia, the chapter 7 trustee, filed a notice with this court in order to settle a controversy between Amboy and debtor. Pursuant to the settlement Amboy would receive administrative priority and payment for rents that debtor owed to its landlord. The issue presented at the hearing on debtor's objection to this settlement is whether Amboy, as mortgagee of debtor's landlord, is entitled to an administrative claim for those rents which were pledged to Amboy pursuant to landlord's mortgage.

This court has jurisdiction pursuant to 28 U.S.C. § 1334 as a matter arising under 11 U.S.C. § 503. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) & (O) as it deals with the determination of an alleged administrative claim against the debtor's estate.

## STATEMENT OF FACTS

On October 23, 1990 debtor filed a voluntary petition under chapter 11 of the bankruptcy code. On October 14, 1992, approximately one month after confirmation of the chapter 11 plan, Amboy filed a proof of administrative claim in the amount of $60,500. The basis of the administrative claim was debtor's use and occupancy of the premises from which debtor conducted its business. The debtor's case was subsequently converted to chapter 7 on March 8, 1993.

Prior to conversion, debtor operated as a wholesaler of nursery stock at 348 Route 601, Belle Mead, New Jersey ("premises"). The premises were owned by debtor's principal, Richard Olesky ("Olesky"). Debtor leased the premises from Olesky pursuant to a lease which required debtor to pay Olesky $4,000 per month as rent. Debtor has not made any rental payments since February 1990.

Amboy held a first and second mortgage on the premises as security for loans given to Olesky. Olesky, also a debtor in a separate chapter 7 bankruptcy proceeding, defaulted on his loan payments to Amboy. The chapter 7 trustee in the Olesky case filed a notice

of abandonment of the premises on February 5, 1992, to take effect on February 24, 1992 if no objections were filed. Accordingly, the premises was abandoned by the trustee in Olesky's case on February 24, 1992. Amboy obtained the premises at a mortgage foreclosure sale which took place on January 10, 1995. The sheriff's deed is dated January 20, 1995.

Initially, the chapter 7 trustee in debtor's case questioned Amboy's administrative claim for rents that had accrued during the chapter 11 proceeding. The basis of the trustee's objection was that Amboy was not the landlord, and hence was not entitled to an administrative claim for rents. Nevertheless, the trustee and Amboy agreed to settle the $60,500 claim for $35,000 rather than litigate the issue. However, at the hearing on the objection to the settlement of controversy, debtor objected claiming that Amboy was not entitled to an administrative claim for use and occupancy during the chapter 11 proceedings.

Amboy asserts that it has an administrative claim against the debtor in this case for use and occupancy during the debtor's bankruptcy proceeding. Amboy asserts that as a result of the foreclosure sale it has acquired the premises. As to the period prior to foreclosure, Amboy asserts that the rents are pledged collateral and that Amboy is therefore entitled to collect rents directly from debtor. In the alternative, Amboy argues that the disclosure statement gives the bank rights to the rents. Relying on a footnote in the debtor's disclosure statement, Amboy maintains that the disclosure statement operates as an agreement or a declaration of an administrative claim owed to the bank by the debtor.

## DISCUSSION

Three issues are raised by this objection. First, this court must determine whether a mortgagee can assert an administrative claim for use and occupancy during the bankruptcy proceeding, based on a pledge of rents in the mortgage, where the debtor leases the premises from the mortgagor. Subsumed within that question is the issue concerning when the mortgagee's rights to rents are triggered. The next issue relates to the effect of a mortgage foreclosure judgment and a mortgage foreclosure sale on the mortgagee's rights to the rents. Finally, this court is asked to determine the legal binding effect of language in a chapter 11 debtor's disclosure statement.

### The Allowance of an Administrative Claim for Use and Occupancy

A debtor in possession must timely perform all post-petition obligations under "any unexpired lease of nonresidential real property. . . ." 11 U.S.C. § 365(d)(3). 11 U.S.C. § 503 allows administrative claims for actual, necessary costs and expenses for the benefit of the estate [1].

> There is no question, of course that the payment of rent for the use and occupancy of real estate ordinarily counts as an "actual, necessary" cost to which *a landlord, as a creditor, is entitled* . . . [citations omitted] . . . In order to survive, a financial entity almost always needs a physical space to occupy. When a debtor owns no suitable real estate of its own, its only choice is to become a tenant, and to assume the obligations of paying periodic rent to a landlord. In such circumstances, therefore, rent is clearly an "actual, necessary" cost of preserving the estate, since the debtor's survival depends on its ability to pay the landlord for the right to possess the space necessary to conduct its business. Because bankruptcy proceedings are considered to be equitable, however, the landlord's right to collect monetary relief is somewhat curtailed; a debtor is generally required to pay only a reasonable value for the use and occupancy of the landlord's property, which may or may not equal the amount agreed upon in the terms of the lease.

*Zagata Fabricators v. Superior Air Products*, 893 F.2d 624, 627 (3d Cir.1990) (citing *In re Mohawk Indus. Inc.*, 54 B.R. 409 (Bankr.D.Mass.1985)) (emphasis added).

---

**1.** 11 U.S.C. § 503 states that: "After notice and a hearing, there shall be allowed administrative expenses . . . including, the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

In this case, it is undisputed that the premises have been used and occupied by the debtor prior to foreclosure sale and that this has been a benefit to the estate. Without the premises the debtor would not have a place from which to continue its business.[2] It is disputed, however, that *Amboy* (as opposed to Olesky, the landlord and owner of the premises) is accorded administrative status for rent for use and occupancy during bankruptcy proceedings. As articulated by the Third Circuit in the *Zagata* case, it is "the landlord, as a creditor" who is entitled to the administrative claim. *Zagata*, 893 F.2d at 627. Mr. Olesky was the owner and landlord and therefore a proper creditor of debtor. There is no similar landlord/tenant relationship or nexus between Amboy and the debtor; thus the next issue is whether Amboy, as mortgagee of the landlord, should be afforded administrative priority status.

### The Relationship between Debtor and Amboy National Bank

A preliminary decision must be made as to the legal relationship between debtor and Amboy, and whether the mortgage executed by Olesky gave Amboy a pledge of rents as further security for the loans to Olesky or title to the rents (i.e. an absolute assignment). Any analysis of an assignment or pledge of rents in a bankruptcy case must begin with the recent Third Circuit case, *First Fidelity Bank, N.A. v. Jason Realty, L.P.*, 59 F.3d 423 (3d Cir.1995).

The Third Circuit in *Jason Realty* decided the issue of whether rents generated by a debtor's real estate are property of the bankruptcy estate. In so doing, *Jason* delineated the requirements of a pledge versus an assignment. *First Fidelity Bank, N.A. v. Jason Realty, L.P.*, 59 F.3d 423 (3d Cir. 1995). As a preliminary matter, *Jason* held that in determining property rights courts must look to state law. *Id.* at 427 (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Commerce Bank v. Mountain View Village, Inc.*, 5 F.3d 34, 37 (3d Cir.1993)). *Jason* found that under New Jersey law assignments of

rents are interests in real property and, as such, are created and defined in accordance with the law of situs of the real property. *Jason*, 59 F.3d at 427.

Turning to state law, *Jason* held that "[a]nalyzing the law of New Jersey ... it appears that the distinction between an assignment and a pledge of security is based on the precise wording of the pertinent mortgage clause." *Id.* (citing *In re Winslow Center Associates*, 50 B.R. 679, 681 (Bankr. E.D.Pa.1985)).

> If the pertinent clause gives the mortgagee a vested interest in rents at the time of the creation of the mortgage, the clause is construed as an assignment. Who has actual or constructive possession of rents is irrelevant. The applicable mortgage provision is deemed a pledge security if the mortgagee's interest in rents does not vest until the occurrence of some precipitating event such as default under the mortgage.

*Id.*

*Jason* dealt with a dispute between the debtor, Jason Realty, L.P., and a creditor, First Fidelity Bank, N.A. *Id.* at 423. Debtor, the owner of real estate, obtained a loan from the creditor and secured the loan with two documents, a mortgage on the real estate and assignment of lease contained in a separate document. *Id.* at 426. The separate assignment stated "THAT the Assignor for good and valuable consideration, receipt whereof is hereby acknowledged, hereby grants, transfers and assigns to the Assignee the entire lessor's interest in and to those certain leases ... Together with all rents, income and profits arising from said leases." *Id.* at 426. The Court determined that the language of the document created an absolute assignment of leases. The assignment had the effect of conveying title to the rents to the creditor/assignee. *Id.* at 429. The debtor retained a license to collect the rents as long as there was no default. Upon default debtor's interest in the rents was terminated and the mortgagee was then entitled to the rents. The Third Circuit stressed that

---

2. The record is unclear, however, as to when debtor vacated the premises after consummation of foreclosure sale. The importance of debtor's

vacating the premises will be discussed below. *See infra p.* 221.

the language of the separate assignment was absolute, and contained words of assignment in the present. The Third Circuit also stressed that the assignment was contained in a separate document. *Id.*

The mortgage between Olesky and Amboy, in pertinent part, states:

"This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, *Borrower does hereby mortgage, grant and convey to Lender the following described property* located in Montgomery Township, Somerset County, New Jersey ... Together With all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, *rents,* royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures *now or hereafter a part of the property.*

Mortgage of August 22, 1986, page 1 (emphasis added).

In this case the rents are pledged as additional security. Nowhere in the mortgage is the word "assignment" used. There is no separate section or paragraph indicating that an assignment of rents had occurred or was intended. There is also no separate document purporting to be an assignment of rents.[3] The only place in the entire mortgage or any of the submitted documents where the word "rents" appears is in the description of the loan collateral. The fact that the pertinent language is not separated from the rest of the language listing the collateral for the debt is an additional indication that the parties intended the mortgage to create a pledge of rents. In fact, in a certification in support of the settlement, Amboy admits that the mortgage "pledges" the rents rather than assigning the rents.

Furthermore, the mortgage states that Amboy did not have the right to the rents until default. Since this language created a pledge and not an absolute assignment, the holding in *Jason Realty* as to the mortgagee/assignee's rights to rents in bankruptcy upon default is distinguishable. *Jason Realty,* 59 F.3d 423.

### The Requirement of Possession of the Premises to Enforce a Pledge

 Once the determination is made that the rents are pledged to Amboy by Olesky, the next inquiry is at what point Amboy is entitled to collect the rents. It is a "well-established rule that a mortgagee [with a pledge of rents] is not entitled to rents or profits until he takes possession of the property or has a receiver appointed." *Eisen v. Kostakos,* 116 N.J.Super. 358, 368, 282 A.2d 421 (App.Div.1971); *see also, Midlantic National Bank v. Sourlis,* 141 B.R. 826 (D.N.J. 1992); *Kirkeby Corp. v. Cross Bridge Towers, Inc.,* 91 N.J.Super. 126, 131, 219 A.2d 343 (Ch.Div.1966); *Stewart v. Fairchild–Baldwin Co.,* 91 N.J.Eq. 86, 89, 108 A. 301 (E & A 1919). Under New Jersey law:

[A] mortgage does not vest in mortgagee an immediate estate in lands, with the right of immediate possession, defeasible upon the payment of mortgage money, but merely gives him right of entry on breach of condition, in which event his estate has all incidents of common law title, including the right of possession subject to equity of redemption, and, meanwhile, mortgagor is treated as owner of lands for all purposes.

*Vineland Savings and Loan Assn. v. Felmey,* 12 N.J.Super. 384, 391, 79 A.2d 714, 717 (Ch.1951); *see also, Midlantic National Bank v. Sourlis,* 141 B.R. 826 (D.N.J.1992); *Stanton v. Metropolitan Lumber Co.,* 107 N.J.Eq. 345, 152 A. 653 (Ch.1930). "[I]f the deed had expressly pledged the income as security for the debts named, the mortgagor ... would have been entitled to the income, until, at least, possession was demanded under the deed; or until his possession was disturbed by a sale under the deed of trust; or, in advance of a sale, by having a receiver

---

**3.** The Court in *Jason* was "impressed that the ... assignment was contained in an agreement sepa- rate from the mortgage." *Jason,* 59 F.3d at 428.

appointed for the benefit of the mortgagee." *Stanton v. Metropolitan Lumber Co.,* 107 N.J.Eq. 345, 348, 152 A. 653, 655 (1930) (citing *Freedman's Savings Co. v. Shepherd,* 127 U.S. 494, 503, 8 S.Ct. 1250, 1254, 32 L.Ed. 163, 167 (1888) (Harlan, J.)). Thus, in the case of a pledge, the mortgagee has rights to the rents upon default, but to exercise these rights the mortgagee must first obtain possession of the premises.

In this case, Amboy's mortgage states that in the event of a default Amboy has the right to possession of the premises and the incidents of ownership, including the right to collection of the rents. This court does not disagree with Amboy's argument that a creditor's security interest survives the filing of a bankruptcy petition. However, Amboy fails to acknowledge the requirement, under New Jersey law and the language of its mortgage agreement, that Amboy needed to take possession to enjoy the rights and benefits of such security interest.

There is no indication that Amboy took possession of the premises any time between commencement of the case to the time of entry of foreclosure judgment or the mortgage foreclosure sale. As discussed above, to be entitled to rents Amboy must have possession. Amboy apparently did not have possession for the entire period prior to completion of the foreclosure sale and therefore, as the debtor argues, Amboy is not entitled to an administrative claim for use and occupancy prior to foreclosure sale because it had no right to collect the debt directly from the debtor and cannot be considered a creditor.

### Post–Foreclosure Claim for Rent

■ Amboy's argues that it has an administrative claim against debtor's estate for use and occupancy of the premises after foreclosure because it became the owner of the property. After consummation of the foreclosure sale Amboy became the owner of the property and at that point, the landlord/tenant relationship existed between Amboy and debtor. *See Zagata,* 893 F.2d at 627. Thus it was not until after foreclosure sale that Amboy, as the owner, had for the first time, the right to collect rents directly from the debtor. Amboy's claim for reasonable value for use and occupancy of the premises after

foreclosure sale is thus allowed as an administrative expense from the period that Amboy obtained the premises at foreclosure sale up until the time that debtor vacated the premises. *See Zagata,* 893 F.2d at 627 (landlord entitled to administrative expense for reasonable use and occupancy during time that debtor occupied the landlord's premises).

### The Merger Doctrine

■ There is an additional reason, aside from failure to take possession of the rents, that Amboy would not be entitled to an administrative claim for rents prior to foreclosure sale. Any rights that Amboy may have had to collect the pledged rents pursuant to the mortgage were extinguished upon entry of foreclosure judgment.

■ Under New Jersey law, the mortgage is merged into the final judgment of foreclosure and the mortgage contract is extinguished. *In re Roach,* 824 F.2d 1370, 1377 (3d Cir.1987). As a result, upon entry of a foreclosure judgment all contractual rights under the mortgage are merged into the foreclosure judgment. *Id.*

[E]ven if a mortgage were not extinguished when a judgment is entered, a final state court foreclosure judgment in New Jersey establishes rights in the property distinct from those conferred by the mortgage. Under New Jersey law, '[t]he final judgment in an action to foreclose real estate mortgage fixes the amount due under the mortgage and directs the sale of the real estate to raise funds to satisfy the amount due.'

*Roach,* 824 F.2d at 1377–78 (citing *Eisen v. Kostakos,* 116 N.J.Super. 358, 282 A.2d 421, 424 (App.Div.1971); accord, e.g., *Central Penn National Bank v. Stonebridge Ltd.,* 185 N.J.Super. 289, 448 A.2d 498, 504 (Ch.Div. 1982)). "In New Jersey, as in many states, the mortgage is merged into the final judgment of foreclosure and the mortgage contract is extinguished." *Roach,* 824 F.2d at 1377. Moreover, all the terms, including the rights and obligations under the mortgage such as pledged rents, merge into the foreclosure judgment and the only thing remain-

ing is the foreclosure judgment itself. *See Roach*, 824 F.2d 1370.

Accordingly, any and all rights Amboy had to the pledged rents based on the mortgage merged into the foreclosure judgment. Thus, even if Amboy had taken possession of the rents, Amboy still would not have an administrative claim for rents prior to entry of foreclosure judgment because once Amboy obtained the foreclosure judgment it is left with no claims based on the mortgage contract other than the judgment itself. *See Roach*, 824 F.2d 1370. If the sale of the premises did not satisfy the foreclosure judgment then Amboy may have a deficiency judgment which it may assert against Olesky[4].

Based upon the foregoing, Amboy had no rights under the mortgage once it obtained a foreclosure judgment on its loan. However, as stated above, once Amboy acquired the premises in the foreclosure sale it became the owner and hence the landlord. The rents that accrued after the foreclosure sale are thus due to Amboy in its capacity as the landlord and a proper creditor.

### The Disclosure Statement Creates a Binding Obligation to Pay Amboy National Bank

Amboy claims that it is entitled to the rents because the disclosure statement acts as an agreement to allow the expenses and the binding nature of *res judicata* prohibits re-litigation of claims and issues decided in a confirmed plan. *See, e.g. Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987). Amboy cites to section 1141 of the bankruptcy code which provides that confirmation of a plan has the effect of binding all parties to the terms of the plan. *In re Laing*, 146 B.R. 482, 484 (Bankr.N.D.Okla. 1992). "It binds not only the creditors but debtors as well. In essence, a confirmed plan is a binding contract and is res judicata as to all issues decided." *Id.* (citing *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *Paul v. Monts*, 906 F.2d 1468 (10th Cir.1990)).

The disclosure statement states, in a footnote, that "[t]he Debtor has not paid its rent during the course of the proceeding. While Amboy National Bank has not filed an administrative proof of claim, it has indicated its intent to claim an administrative expense for use and occupancy." *Debtors Confirmed Disclosure Statement*, at 10. Amboy did not cite to any provision dealing with its administrative claim in the reorganization plan.

The court notes that the case law and statute cited by Amboy deal with the binding effect of a *confirmed reorganization plan.* Amboy's argument, while accurately stating the law concerning the effect of confirmation of a reorganization plan, simply does not apply to the facts of this case because the operative language relied upon by Amboy is contained in the disclosure statement and not in the plan. Furthermore, Amboy did not cite a single case standing for the proposition that a disclosure statement binds creditors and debtors as does a confirmed reorganization plan. To the contrary, this court finds that a disclosure statement is not a binding contract and has no *res judicata* or collateral estoppel effect on the court and cannot bind the parties for the reasons stated below.

The case law in the area of disclosure statements is scant. Unlike the issue of a reorganization plan, this court found no case dealing squarely with the issue of the contractual or binding nature of a disclosure statement. However, the Third Circuit's discussion of disclosure statements in general in *In re Century Glove* is instructive. *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3d Cir.1988). Based upon that case and an analysis of the bankruptcy code, this court finds that disclosure statements are not contractual in nature and do not bind the parties.

As with most statutory analysis, a starting point is the statute itself. The section of the bankruptcy code which deals with disclosure statements is 11 U.S.C. § 1125. That section provides in relevant part that:

(b) An acceptance or rejection of a plan may not be solicited ... unless ... there is

4. This court takes no position as to the status that deficiency claim would have in Olesky's

bankruptcy proceeding.

transmitted ... a written disclosure statement. The court may approve a disclosure without a valuation of the debtor or an appraisal of the debtor's assets.

11 U.S.C. § 1125(b).

11 U.S.C. § 1125(a) defines certain terms such as "adequate information." Subsection (c) permits the different disclosure statements to be sent to different classes, as long as each member of each class gets the same disclosure statement. Subsection (d) governs the procedure to determine adequacy of information in a disclosure statement. Subsection (e) relates to the sale of securities under the plan. Subsection (f) relates to debtors who have elected to be considered a small business under 11 U.S.C. § 1121(e). *See* 11 U.S.C. §§ 1125(a), (c)–(f). None of these sections provide that a disclosure statement binds the parties.

The bankruptcy code does provide, however, that "the provisions of a *confirmed plan* bind the debtor, ... any creditor, equity security holder, or general partner in the debtor." 11 U.S.C. § 1141(a). There is no similar provision in the bankruptcy code or the federal rules of bankruptcy procedure which provides that a disclosure statement binds any party in any way. Thus, it appears that when Congress wants to make a bankruptcy document contractually binding, it knows exactly how to do so. The complete absence of any reference to the binding nature of a disclosure statement can only be interpreted to mean that Congress intended confirmed reorganization plans, and not disclosure statements to be binding.

▮ Furthermore, when one examines the purpose of disclosure statements, as discussed by the Third Circuit in *Century Glove, Inc.*, it becomes clear that disclosure statements are intended to facilitate the negotiation process and to be a flexible tool to enable the various creditors and the debtor to work out a mutually agreeable arrangement. 860 F.2d 94. *Century Glove*, which primarily dealt with the issue of solicitation of acceptances of reorganization plans, analyzed extensively the process leading up to the confirmation of a plan. *Id.* at 100–102. As part of its analysis, *Century Glove* examined the purpose and requirements of a dis-

closure statement and found that "Congress was concerned not that creditors' votes were based on misinformation, but that they were based on no information at all." *Id.* (citing H.R. 95–585, at pp. 225–26, 95th Cong., 2d Sess., reprinted in, 1978 U.S.C.C.A.N. 5963, 6185 (House Report)). *Century Glove* further found that, "[i]n enacting the bankruptcy code, Congress contemplated that the creditors would be in active negotiations with the debtor over the plan.... The necessity of 'adequate information' was intended to help creditors in their negotiations." *Id.*

The Third Circuit thus refused to adopt a broad reading of 11 U.S.C. § 1125 because to do so "can seriously inhibit free creditor negotiations." *Id.* at 101. The Court held that, "[t]he purpose of negotiations between creditors is to reach a compromise over the terms of a *tentative* plan. The purpose of compromise is to win acceptance for the plan. We find no principled, predictable difference between negotiation and solicitation of future acceptances." *Id.* (emphasis added).

In the spirit of using disclosure statements as a means to negotiate or solicit acceptances it would be senseless to adopt a reading of 11 U.S.C. § 1125, or the code in general, to provide that disclosure statements contractually bind the parties. Such a ruling would leave no room for negotiation, because the parties would already be locked into the positions and provisions contained in the very document submitted to facilitate the negotiation process. This court thus finds that the disclosure statement does not act as a contract and does not bind the parties to its terms or have a *res judicata* effect on the court.

There is a line of cases, however, which holds that under principles of "judicial" or "equitable" estoppel a debtor may be estopped from later asserting a position or taking an action that is inconsistent with a position previously held by the debtor in the disclosure statement. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir.1988); *In re Payless Wholesale Distributors, Inc.*, 989 F.2d 570 (1st Cir.1993); *In re Neptune World Wide Moving, Inc.*, 111 B.R. 457 (Bankr.S.D.N.Y.1990);

*In re H & L Developers, Inc.*, 178 B.R. 71 (Bankr.E.D.Pa.1994); *In re Envirodyne Indus., Inc.*, 183 B.R. 812 (Bankr.N.D.Ill.1995). A careful distinction must be drawn between applying the principles of equitable or judicial estoppel and enforcing a document which is contractually binding. Where the disclosure statement is held to be a contractually binding document all parties are held to its terms irrespective of subsequent conduct[5]. The focus is on the language of the contract. However, estoppel deals with fairness. It focuses on the party who prepared the disclosure statement who must have engaged in conduct which would make it inequitable (equitable estoppel) or an abuse of the judicial system (judicial estoppel) to permit that party to act in a manner inconsistent with a provision of the disclosure statement.

The Third Circuit has explained that creditors rely heavily upon disclosure statements in formulating the decision whether to accept or reject a proposed plan. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir.1988). The Court held:

> In order to preserve the requisite reliability of disclosure statements and to provide assurances to creditors regarding the finality of plans which they have voted to approve, we hold that under the facts here present Oneida's failure to announce this claim against a creditor precludes it from litigating the cause of action at this time.

*Id.* at 418.

The court found that it would be unjust to permit debtors to play fast and loose with the court and the parties who are relying on the legitimacy of the disclosure statement. *Id.* In *Oneida*, as in many of the estoppel cases, the proponent engaged in some duplicitous or unfair act which warranted the application of either judicial or equitable estoppel. *Oneida*, 848 F.2d at 417 (debtor's silence in the disclosure statement concerning certain litigation "was deafening."); *In re Payless Wholesale Distributors, Inc.*, 989 F.2d at 571 ("[Debtor's conduct] is a palpable fraud that the court will not tolerate, even passively."); *see also Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir.1953) (judicial estoppel is to be applied where "intentional self-contradiction

is being used as a means of obtaining unfair advantage in a forum designed for suitors seeking justice.").

Most important, in this case, there was no fraud or misrepresentation. The reader of the disclosure statement knows from reading the footnote that there may be a claim "out there." Such a claim would only reduce what the unsecured creditors would receive. No one was misled. In fact, Amboy does not even raise the issue of estoppel in its brief and made no allegation of unfair or unjust conduct by the debtor. Rather Amboy simply seeks to hold debtor contractually liable to an ambiguous footnote contained in the disclosure statement. Thus, the theories of estoppel do not apply.

■ Even if a disclosure statement did bind the parties, there would be no *res judicata* effect of the footnote in the disclosure statement in this case. In order to apply *res judicata*, the issue must be resolved previously. *Laing*, 146 B.R. at 484. The statement in the disclosure statement was innocuous and took absolutely no position with regard to Amboy's alleged claim. At the time of the filing of the disclosure statement, debtor realized that it had not paid rent and acknowledged that Amboy intended to file an administrative claim. However, the disclosure statement does not state the identity or the amount of the claim or take a position as to whether the claim is proper. The disclosure statement simply states that Amboy asserts a claim, and nothing more. The footnote clearly left the issue to be resolved at the time a party filed a proof of claim. Furthermore, as discussed above, Amboy's administrative claim is mentioned nowhere in the reorganization plan.

## CONCLUSION

For all of the above reasons the objection to the settlement of controversy is allowed and the approval of the settlement is denied. Amboy is not entitled to an administrative claim for rents prior to consummation of the mortgage foreclosure sale of the premises. However, after the mortgage foreclosure sale was consummated Amboy is entitled to an

---

5. Subject to extreme conduct which is not at issue here.

administrative claim for the reasonable use and occupancy of the premises, for the time period that debtor actually occupied the premises after the deed was issued to Amboy. Counsel for debtor is directed to submit an order within ten (10) days of the date hereof.